The first case up for argument today is Veland v. Liberty Tax, Inc. We have Mr. Toll arguing for the appellant, who I see has reserved two minutes for rebuttal. Good morning, Mr. Toll. Good morning, your honors. May it please the court, Steven Toll, plaintiff, appellant. We have really streamlined this appeal for the court. You know, down below, we had 24 false and misleading statement, a case that spanned a class period of four and a half years. We have really refocused the appeal to just point out two of the major themes or the statements that captured the essence of the case, so this would reduce the case to a 14 and a half month case, so two statements at issue plus the issue of lost causation. The first statement is the one that I'll touch on is September 6th, 2017. And paragraph 143, and both these statements are very short and simple. Two sentences for this one, one sentence for the other. This one says the company had engaged in a deliberate succession planning process, which resulted in Ed Bruno joining the company as chief operating officer as an interim step before assuming the role of CEO. The company is currently finalizing its succession plans. However, the board has determined that it is the company's best interest to terminate Mr. Hewitt at this time. Now the district court said he dismissed it because said we did not allege the statement to be false and misleading, but you should reverse on that reason alone is just go look at the very next paragraph, paragraph 144 of the complaint, which says the bold and italicized statement in paragraph 143 is false and misleading and omitted material facts because the company failed to inform investors of the reasons for the board's termination of Hewitt that was at least premised upon the scan investigation. And two, the statement suggests Hewitt's termination was related to the deliberate succession planning process, as opposed to his egregious misconduct detailed herein. So it's funny, Mr. Toll, let me, let me ask you about that because when you read the statement, there's two different sentences there. The first sentence is about the succession plan. And then the second sentence that says, despite this not being finalized yet, we're going to, uh, you know, we're going to terminate Mr. Hewitt because, uh, you know, he's going to depart because it's not in the best interests of the company. So doesn't that suggest that there's two separate things going on there? That's the succession plan. But even though that's not finalized, we're getting rid of him now. Right. Isn't that how that should be read by an investor? I don't think so. You're honest. So now you're getting into one of the themes I wanted to, uh, get to we're on a motion to dismiss and, you know, law, all logical inferences is to be construed in our favor. And I think, and again, you're also supposed to look at what would an reasonable investor think reading this? You know, would this be material to an investor? Wouldn't the investor, wouldn't it be, I think the test under Northway and basic versus Clevenson is, you know, substantial likelihood that a reasonable investor would find this information important in deciding whether to invest. And I think it's critical to an investor, whether the CEO is going to be, was terminated because of egregious misconduct, both on a personal and business nature that affects the company dramatically. And they use the word succession plans in both sentences. There's no, they could clearly have laid out what the truth was, or if they wanted to really keep it separate, they really could have kept it two different concepts, but they've joined the two sentences together. I think a fair reading of it, your honor, or at least again, on a motion to dismiss should be the logical inference should be those two are tied together that he is leaving as part of the succession plans, which are still being finalized, but if we disagree with you, that it should be read tied together like that, what case on your other point, what, what case, when have we ever said, or any, any circuit court said that if a company announces they're terminating their CEO, it's not in the best interest of the company, or we're terminating our CEO that they have to give the investors the particular reason, or it's a misleading statement. What, when have we ever said that? I don't know if that's been said directly, Ron, but what the standard of law constantly is, is which this court has said is half truths are actionable. There can be statement that have true comments in it or true statements as part of the entire statement, but it still can be misleading. And this is just a classic example of that. I mean, clearly this guy was terminated the day before they had this board meeting where Skadden or played out its report, getting into all kinds of misconduct, they terminate him at that time. And then they tell the public, well, he's gone, but we're also just part of succession planning we're working on here. It is a classic half truth, Your Honor. There was a concern also with the causation element here in the sense that the Virginia pilot article, when it reported on the Skadden findings, did not result in a diminishment of the stock price that day. I know your argument is that the market needed time to learn all the facts, digest the information, but it doesn't seem to have support in law. Help me out on that. Oh, Your Honor, I will. You take a look at the Dura Supreme Court case and then three cases from this circuit, Lorelei, I forgot the second one for a second. The third one, Your Honor, you were on the panel and I wanted to read it from the financial guarantee case in 2015, where it said about loss causation. The purpose of loss causation is to require a plaintiff to provide a defendant with some indication of the loss and the causal connection the plaintiff has in mind, not to make a conclusive proof of that causal link. It's not meant to impose a great burden on a plaintiff. If there is an arguably an intervening event, something that severs the connection, that the chain could be broken. But as this court said, Your Honor, such as a matter of proof at trial and not to be decided on a 12th motion to dismiss. So what came out in the Virginia pilot article was simply all this salacious elements on what Mr. Hewitt was involved in. But really, you see what happens in November, December and February. There are six different resignations announced each. So the first announcement in the Virginia pilots, like your classic tip of the iceberg, first disclosure. These other disclosures that's come out, the KPMG one is probably the most interesting because they talk about what's happening is the market thinks Hewitt is gone as CEO. But what's really happened is he's controlling the strings of the company. But those are not your two misstatements. Oh, yes, Your Honor. I'm sorry. It does link. I don't understand that. Help me out. OK. It links up to termination. Again, what does termination mean? Termination means the CEO is gone. He's not running the company day to day. What we find out from these later resignations and KPMG said it explicitly is that we no longer can rely on management because Hewitt is running the company. Basically, he's interfering. He's dealing with the franchisees. He's dealing with the area developers. And so the press release itself said that he had control of the class B shares and therefore had control of the board. So you're right. That he could control everything with those class B shares. Your Honor. Not exactly. Remember to the investors. Yes, he can control the board. Yes, he owns the class B shares. He's not. There's a massive difference between a CEO of a company, as you know, and the chairman of the board of a company and the directors. The CEO is running the company day to day. The directors pop in for quarterly meetings and weigh in with supervision and so on. But they so the market knew he remained as chairman. You're correct. But the market thought he was gone and running the day to day operations and he was not. And it was destroying the company and led to all these resignations. So it all ties in to the termination statement not being accurate. All right. I see. I'm out of time. Yes. All right. Thank you, Mr. Toll. Mr. Mundia. Good. Good morning, Your Honors. Tariq Mundia for Liberty Tax. Your Honors, Judge Garoff is absolutely right. Based upon the lack of a misstatement and on loss causation with respect to the misstatement, Mr. Toll has now limited this misstatements to two. One is a December 2016 statement where he says the company somehow misled the investing public because they he stated that the company's compliance task force had been very successful. It is clear on the second look at law that that is a puffery. It's too general for any investor to rely upon that statement. I think that's absolutely clear. And Judge Garoff, this was was clearly with respect to the statement in the press release. Judge Bianco, you read that. You read that press release absolutely correctly. The first sentence talks about a succession plan, and it talks in terms of the past tense. Mr. Bruno had been hired, had been hired as part of a succession planning effort. And then it goes on to say that the company has determined that it's in the best interest of the company to terminate Mr. Hewitt. It then goes on to say that there there is no assurance that the company will be able to buy out Mr. Hewitt, and he may still have control over those class B shares, which give him complete control, obviously. Now, we also have a new issue on appeal, which is they they now say that he was involved in managerial control. And that so should be disclosed. One of the questions, Your Honor, you asked Mr. Tull was, is there any authority that says that once you disclose that the officer has been terminated, that you have to disclose all of them for all of the reasons? And the answer is there is no law. And the reason there's no law on that, Judge, because item 502 of the Security Act says clearly if the registrant's principal executive officer is terminated from that position, the registrant must disclose the fact of the event and the date of the event. And that is clearly what happened here. There is no disclosure obligation in any way, shape or form. What were you quoting from? Well, what were you quoting from their details about the back and forth on exactly what happened with respect to Mr. Mondaya, Mr. Mondaya? There was a question. Judge Newman asked you what you were quoting from there that you just read. And what were you quoting? It's the item 502 of the 33 Act regulations. And it's SEC form SK. OK, your position, your position is that even if a company is terminating an executive for misconduct, that the disclosure does not have to give the reason it's sufficient to announce the termination or to say it's not being terminated because it's not in the best interest of the company, that no reason be given to the investors? That's right. You know, if the company discloses that it believes the termination is in the best interest of the company, that that is, we believe, sufficient. And there's no law in the circuit in this or any other circuit that we're aware of that requires a disclosure like that. And it's consistent with the Supreme Court's opinion versus Green, which says that there is no duty to disclose uncharged misconduct or corporate mismanagement. So whether you look at item 502 or whether you look at Santa Fe versus Green and its progeny, there is no there's no overriding duty. What about this separate issue of control, though? If, for example, over time, it became clear that Mr. Hewitt was not going to relinquish those class B shares, that he said, forget it, I'm not negotiating anymore. I'm going to continue to run this company. It'd be your position that there would be no duty on the company then to supplement what was said in that press release. Is that your position? That might be. But if we fast forward to to November of 2017, the company did put out an 8K, which outlined Mr. Gorel's resignation letter and disclosed in gory details exactly what happened with respect to the negotiations and how they had broken down. So if there was a development that was material, for sure, there might be disclosure of disclosure obligation. But that's not this case. With with respect to the last position, it is crystal clear that on November 9th of 2017, the Virginian pilot laid out in in excruciating detail. And it just was the salacious things that Mr. Cole is talking about, laid out in excruciating detail what had happened because somebody had leaked the scouting report. And we were surprised to see in Mr. Pope's reply brief that he says that the Virginian pilot did not disclose the reasons for Mr. Hewitt's termination. Well, the first sentence of the Virginian pilot article says that the Virginian pilot has learned that Hewitt was fired after the Liberty Tax Board received the findings of extensive internal review conducted by a high powered law firm. The review was initiated to look into claims that Liberty employees that Hewitt having sex in his office, et cetera, et cetera. And during the review, the scope was expanded to include other allegations that Hewitt made preferential treatment to employees and franchisees. He was believed to be involved with romantically and that he placed his personal interest above the company. And then it goes into detail about how Mr. Hewitt is still chairman of the board, has controlling shares in the company and allows him to choose for the members of the board besides himself. It also goes on to say that on that Monday, Hewitt replaced two board members, another board member retired and the CFO resigned. That's all in the public domain. And the stock price went up by four percent. A few days later, the company put out an 8K, which refactored all of the details going on at the company. And in that 8K, and this is. A joint, this is a joint appendix at page. One, one, three, six. I'm sorry, one, seven, six. The the letter that the company disclosed says most recently, two directors were removed on November five. One resigned on November six. The CFO resigned on November seven. And the VP of financial products resigned in September 2017. These changes contravene the board's decision to terminate Mr. Hewitt and allow him via his class B rights to, in effect, manage the company. That's the point you raised, Judge Bianco. This is an 8K put out by the company on November 13th. And the stock price goes up. So by November 13th, all of the issues that they say was supposedly not disclosed, whether in December of 2016 or in September of 2017, all of those issues were disclosed and the stock price went up for the time. And the council council council, is it true that the company made it discharged him not for cause? That's true, Your Honor. And you shed any light on why the company did that? Your Honor, it was the company's position that by discharging him for cause would raise a number of litigation issues. And the last thing this company wanted was protracted litigation. Well, litigation, meaning he would sue to get his severance pay. That's right. Something along those lines, Your Honor. And rather than defend that, they preferred to tell the public that he was discharged not for cause. Well, Your Honor, they didn't say the not for cause. They said it was the best interest of the company that he be terminated. Was it? Yes, it was. It was in the best interest of the company to terminate him not for cause. Your Honor, it's our position that the board decided under all the circumstances that it was the best interest of the company to terminate him not for cause because it could be protracted issues with respect to litigation, et cetera. But all of that was disclosed. Well, now you have litigation over full disclosure, so you're going to get sued either way, aren't you? It's that's possible, Your Honor. But I think it's why not discharge him for cause and only have one lawsuit? Your Honor, I think that that's that was that decision was relegated to the board's business judgment, Your Honor. And was this really to avoid another count in this lawsuit or was it simply to assure his severance pay? Your Honor, it was it was there to it was there for a number of reasons, what many of which were to make sure that the company could move forward after the very significant dislocation caused by Mr. Hewitt's misconduct. I think your time is up, Mr. Mandaya. Thank you. Thank you. Paul, you have two minutes for rebuttal. Thank you, Your Honor. You know, we're dealing with a bad actor here, right, Mr. Hewitt, and the question is, do we have a claim for investors who lost money once everything really came out? And I go back, Judge Bianco, to your question. When you look at paragraph 143 in those statements, I know you and the other judges are looking at in the context of reading defendants briefs and parsing through. But again, you have to put your eyes in reviewing this and think of the reasonable investor reading that it really is pretty impossible not to think that the termination is part of the succession planning to an investor, a reasonable investor. And, you know, I would think that reading that he was basically let go immediately would let everybody understand that there was something afoot. I mean, I'm not suggesting that you have no claim here, but the whenever anybody's terminated effective immediately, it either suggests that they have a serious health problem that's just been discovered or there were shenanigans going on. And since it was reported that it was in the best interest of the company, it would seem to preclude the former. Why wouldn't an investor right away have antenna up with an immediate termination? I think, Your Honor, because it's all if they had just said he's terminated and nothing else, that's one thing. But they have tied it in in two sentences to the succession planning that was going on. It's not completed. I mean, they are telling investors that, you know, we hired this other guy and that's part of our succession plan. And though the succession plan is not completed, we think it's in the best interest of the company for this fellow to go now, right away. That that's unusual. It may be unusual, Your Honor, but I think, again, when they speak, you've got this obligation to disclose if they did not say anything about how a reasonable investor would have understood that. And would a reasonable investor have gone like, oh, well, they're just they're just pursuing their succession plan. I mean, you're you're saying to us that that's the reasonable inference, and I'm just questioning whether it is. I understand. I hear you, Your Honor. But I think it is a logical inference to be drawn, and it should be read in our favor as a plaintiff's in the case. Thank you. Thank you, Mr. Toll. Thank you to both of you. And we'll reserve decision. Thank you.